## IN RE NICHOLAS B.*

Superior Court, Judicial District of Middlesex, Child Protection Session
at Middletown
File No. H14-CP09-009918-A

Memorandum filed July 8, 2011

*Proceedings*

*Olia Yelner*, for the respondent father.

*Barbara J. Ruhe*, for the petitioner Ida S. et al.

* Affirmed. *In re Nicholas B.*, 135 Conn. App. 381, 41 A.3d 1054 (2012).

*Emily J. Moskowitz*, for the respondent guardian Deborah R. et al.

*John J. Ghidini III*, guardian ad litem for the minor child.

BENTIVEGNA, J.

I

## STATEMENT OF CASE

This is a termination of parental rights (TPR) case that was transferred from the Probate Court. The parties to this matter are: petitioner(s), maternal grandmother, Ida S., and maternal uncles, Nicholas S. and Charles S.; respondent father, Allen B.; and the child, Nicholas B. The mother, Lisa B., died on March 22, 2004. The child's co-guardians are Deborah R. and Alberto R. (co-guardians). The Department of Children and Families (DCF or department) is not a party but was ordered by the court to conduct an investigation and issue a study regarding termination of parental rights.

The matter was tried on March 7, and June 9, 2011. The court took judicial notice of the Superior Court file and the Probate Court file. The following witnesses testified at trial: Dr. Bruce Freedman (psychologist); Liz Santiago (DCF social worker); Deborah R. (co-guardian); Jonathan B. (sibling); Allen B. (father); Joshua B. (sibling); and Leon B. (paternal uncle).

The court finds that it has proper jurisdiction of the matter, notice of the proceeding was provided, and no action is pending in any other court affecting the custody of the child. The court has fully considered the criteria set forth in the relevant Connecticut General Statutes, as well as the evidence, applicable case law, demeanor and credibility of the witnesses, and arguments of the parties in reaching the decisions reflected in the orders that issue in this memorandum. After

due consideration, the court grants the termination of parental rights petition.

## II

## FINDINGS OF FACT

Having weighed all the evidence and assessed the credibility of the witnesses, the court finds the following relevant facts by clear and convincing evidence.

### A

### Procedural and Historical Facts

Nicholas was born in New Britain, Connecticut, on December 12, 2002. He is the tenth child born of the marriage of Lisa and Allen. His nine older siblings are: Joshua (b. 7-14-88); Jonathan B. (b. 2-28-90); Andrew B. (b. 3-18-92); Jamie B. (b. 1-14-93); Nicole B. (b. 5-28-95); Rachel B. (b. 8-1-96); Lauren B. (b. 2-21-98); Samuel B. (b. 8-24-99); and Luke B. (b. 5-15-01).

On or about July 7, 2003, mother was hospitalized at New Britain Hospital after being diagnosed with terminal cancer. Nicholas went to live with Deborah and Alberto. He was six months old. Between July, 2003, and November, 2003, Nicholas returned to his mother's care for a period of time, but mostly, he lived with Deborah and Alberto.

On or about November 5, 2003, mother nominated/consented to Deborah and Alberto as standby guardians of her ten minor children. She was terminally ill with cancer, and father was incarcerated in Maine. On or about November 10, 2003, father nominated/consented to Deborah and Alberto as standby guardians of his ten minor children.

On or about January 8, 2004, Deborah and Alberto were affirmed as the temporary co-guardians of all the children by the Avon Probate Court (Probate Court).

On or about January 14, 2004, Deborah and Alberto were appointed as temporary guardians of all the children, except Nicholas, for whom they remained co-guardians. The father was ordered to give the guardians thirty days notice of his attempt to resume physical custody of the children.

On March 22, 2004, Lisa passed away. Father was incarcerated in Maine. The children were either living with the co-guardians or were living with other temporary guardians.

On or about April 15, 2004, the Guardian Ad Litem for the ten minor children petitioned the Probate Court for an order temporarily restricting father's access to and contact and communication with his children based on the circumstances and the children's best interest. Father had been released from prison and was attempting to contact the children without the knowledge or consent of the temporary guardians. The children were struggling with the mother's death and the guardians were trying to maintain a stable living environment for the children.

On April 20, 2004, the Probate Court ordered that father make arrangements for any contact with the children with each temporary guardian and not attempt to contact the children directly or indirectly while the children were at school. A hearing on these issues was scheduled for May 4, 2004.

After the hearing on May 4, 2004, the Probate Court continued the appointment of Deborah and Alberto as temporary guardians of Nicholas. Father was ordered to give thirty days notice when he intended to resume physical custody of the child. The court ordered that the temporary guardians may authorize visitation with the father to be supervised by the guardian(s) while father was incarcerated if they felt it was in the child's best interest.

On June 21, 2004, Dr. David Russell, a clinical psychologist, wrote to the Probate Court and recommended a three-phase plan of contact/visitation. The recommendations addressed the issues of father's need for contact with the children, the children's need for stability, and the temporary guardians' need to avoid being put under undue stress. The letter referenced the three oldest male children but was applied to all the children. Under the plan, the first phase was for father to begin contact with the children by writing two letters per week. It was important for father to be supportive of the placements. The temporary guardians were to provide father with feedback regarding the children's reactions to the letters. After six weeks of stable and trouble-free letters, the temporary guardians could then move to phase two, where father would be able to make weekly phone calls to the children in addition to writing letters. After six weeks of trouble-free contact, the temporary guardians could then move to phase three, where father would be able to have monthly visitation if the children desired. If any difficulties arose, then the contact would be adjusted to the last trouble-free level. The evidence demonstrated that father never made any real efforts to comply with the recommended contact/visitation plan.

On June 29, 2004, the Probate Court continued the award of temporary custody of Nicholas to Deborah and Alberto. The court also ordered monthly supervised visitation with father where he was incarcerated, subject to the temporary guardians' discretion that such visits were beneficial to the child. While he was incarcerated, father never completed the paperwork required for prison visitation.

On December 1, 2004, the Probate Court held a hearing on maternal grandmother's application for removal of father as guardian based on abandonment and denied proper care. Father had been released from prison a week before and had notice of the hearing, but he failed

to appear. When father was not incarcerated, he failed to appear at most of the probate hearings and to keep his whereabouts known.

On January 7, 2005, the Probate Court made a finding of abandonment and denied proper care against father, and he was removed as guardian of Nicholas. Pursuant to General Statutes § 45a-616, Deborah and Alberto were appointed as co-guardians with all rights and duties under General Statutes § 45a-604 (5) and (6). The prior visitation orders were revoked until further order of the court. On or about January 20, 2005, Deborah and Alberto were also appointed Guardians Ad Litem for Nicholas.

From November, 2003, until April, 2005, father had no contact with Nicholas and failed to comply with the recommendations and court orders to facilitate contact/ visitation with the child.

On April 13, 2005, the court (*Prestley, J.*), after a hearing, granted a restraining order for six months against the father for all of the children, including Nicholas. Under the restraining order, father was prohibited from having contact with Nicholas and Deborah and Alberto and their biological children. The request was based on father's lack of contact with Nicholas and an e-mail sent by father to Joshua B., discovered by the co-guardians, which included threatening language toward the co-guardians. See Guardians' Exhibit D.[1]

---

[1] "From: Allen [B.]

To: joshau[b]@hotmail.comCC . . .

Subject: *laughing* Date Wed. 02 Mar 2005 17:56:48-0500

Oh son, I know exactly what I'm doing. I deliberately didn't show to keep my agenda going. It's terrible to have to manipulate the system this way, but unfortunately its' the only way. Que, trust me son, I spent eight months planning this in detail. It's important that the judge, lawyers (including mine), Edie, Chuck, Nick and custodians be caught completely off guard continually. They never know when and where to expect me to show and not show. Everything's going according to my plan. The more confused and frustrated they become, the better. And I haven't even begun the second phase of the plan yet. Wait till they get a load of what's coming. And there's nothing they can do to stop me. Before I explain a few things, let me say

On or about August 17, 2005, father wrote a letter to the Probate Court requesting a hearing regarding contact with his children. His address was listed as 118 Main Street, Hartford, Connecticut.

On August 23, 2005, father filed a motion to open judgment regarding the restraining order, claiming that

this: All this petty stuff regarding visitation and the like is just hogwash. It's just a bunch of wrangling by a few high-priced blood-sucking attorneys, a gaggle of religious hypocrites and probate court judge drunk with the excesses of her own power tripping. Here's the bottom line: According to the laws of the state of Connecticut, if I petition the probate court to regain custody of my biological children and I have a home, gainful employment, insurance and someone to watch you kids during the day, then THERE IS NOTHING THAT THE JUDGE CAN DO BUT PLACE YOU ALL BACK WITH ME. Do you get that? Judge Becker, though frustrated as she is with me, will be mandated by law to return you all to me. *laughing* That's why I'm not worried in the least. I have all the power and they know it. I'm just gonna continue to play them the way they played me and your mother till she succumbed to death. And yes, I showed up at your job deliberately 'cause I learned that Nick was working the same day. I needed to have him see me march into the store. I had the added bonus of seeing Drew and Liv . . . with your Uncle Chuck. The timing couldn't have been better had I planned it. I don't say that lightly. When you get your summer break be prepared to move out of the [N]'s home for good. Now you might be curious why I didn't show for the court date. Well, I had begged the court by letter to appoint me a new attorney because Howard Haims is so ineffective. And I was turned down again and again. So what's the only way to get the them to appoint me a new attorney? Get him so angry at me that he has to ask the court himself to be relieved from the case. The March 1st case was the last straw for him. Now I have a new attorney. See how beautifully that worked? Also, Marcia Macklin with DCF needed to be relieved from visiting the case and a new worker appointed. But the court wouldn't grant the request. So what do you think I did? I found out where she went to church in New Britain and showed up. Now that she's had social contact with me, she had to drop herself from the case. Now we have a new DCF worker. Also, I petitioned the court to have the guardian ad litem relieved from his duties and they granted that request. Okay: so new guardian ad litem, new DCF worker, new lawyer for Allen [B]. These clowns don't know how to handle me. I'm too strong for them. They don't like being outfoxed. . . . Make sure you let the girls know that I have tried and tried to contact them by phone for Christmas, birthdays and other times and the custodians have banned me from even talking to them. . . . Whenever you get around Liv, Gui, Coqui and Mo let them know that I'm around and have tried to reach them and am being denied. I need for the girls to know that I care. That chance encounter with Drew and Liv was a classic example of how God

he was never served, and the guardians knew precisely of his whereabouts.

On September 20, 2005, the court (*Alvord, J.*) held a hearing on father's motion to open judgment and the co-guardians' request to extend the restraining order for an additional six months. Father appeared at the hearing and testified on his behalf. After the hearing, the court denied the father's motion to open and extended the restraining order six months. The restraining order remained in effect until March, 2006.

On April 4, 2006, Family Services of Central Connecticut wrote a letter to the Probate Court indicating that father was eligible for supervised visitation services through the agency.

On or about June 20, 2006, father wrote a letter to the Probate Court requesting that visitation be addressed at a scheduled hearing on June 28, 2006. He provided his sister's address in Bronx, New York. Psychological evaluations of the children were ordered.

On June 27, 2006, the Guardian Ad Litem filed a petition to terminate the parental rights of father with respect to Nicholas based on abandonment and no ongoing parent/child relationship.

On or about November 20, 2007, the guardians requested that the Probate Court transfer the case to the Superior Court pursuant to General Statutes § 45a-623.

On December 20, 2007, the Probate Court ordered the matter transferred to Superior Court for Juvenile Matters.

In January, 2008, Dr. Freedman conducted a court-ordered evaluation of the children and father.

---

works in His providence to protect you kids. I love you son. Keep writing. *smile*"

On or about May 28, 2009, maternal grandmother filed a petition in the Berlin Probate Court seeking to terminate the parental rights of the father based on abandonment, no ongoing parent-child relationship, and failure to rehabilitate. On June 9, 2011, the petitioner withdrew the failure to rehabilitate ground.

On June 19, 2009, the Probate Court ordered an investigation and report by the department, which was completed on September 16, 2009.

On or about July 8, 2009, maternal grandmother filed a motion to join additional petitioners, maternal uncles, Nicholas S. and Charles S., as relatives pursuant to General Statutes § 45a-707 (6). The motion was granted by the Probate Court on August 18, 2009.

On or about July 13, 2009, the father filed a request for visitation with the Probate Court.

On or about November 16, 2009, the guardians, Deborah and Alberto, filed a motion to transfer the case to the Superior Court for Juvenile Matters pursuant to General Statutes § 45a-715 (g). The motion was granted on November 19, 2009.

B

Mother

Lisa was born on February 21, 1966. She was raised in Berlin, Connecticut. After graduating from high school, she attended Hofstra University where she met father, and they began a dating relationship. They left school before graduating and were married on June 3, 1987. During their marriage, they produced ten children. Their first child was born in July, 1988. From 1987 to 2003, the family lived in several different states, living in their own home as well as in shelters and motels. The family also stayed with maternal grandmother in Connecticut. The children were homeschooled by mother. At various

times, father was a fugitive from justice and experienced several lengthy periods of incarceration. Mother cared for the children during father's periods of incarceration.

Sometime in 2003, mother was diagnosed with breast cancer. She did not seek traditional medical care. As her health deteriorated, she had difficulty caring for all the children. The situation was complicated by father's incarceration. Mother and children moved from Minnesota to Connecticut after father was arrested on a Maine warrant. After moving to Connecticut, a referral for physical neglect was made to DCF and substantiated. Mother was unable to properly care for her children due to her terminal illness.

During this period, Deborah and Alberto became familiar with the family through church and offered to assist the family. Before mother died, mother and father agreed to give temporary guardianship of all ten children to Deborah and Alberto with the understanding that families would be found within the community and church to care for the children. When mother passed away on March 22, 2004, Nicholas was living with the co-guardians, and homes had been found for all the older children.

## C

### Father

Allen was born on March 10, 1963. He is forty-eight years old. He grew up in New York City. After graduating high school, father attended Hofstra University, where he met mother. They dated for several months before leaving school without graduating. They were married in June, 1987.

Father joined the Air Force in 1988. While father served in the Air Force, the family lived in several different states. He was honorably discharged in 1992.

After leaving the Air Force, father went to work selling advertising. From 1992 to 2000, he was employed as an advertisement representative for several different companies. At some point, father started his own firm and was doing business in several states. Father testified that things went well for awhile, but he eventually ran into trouble because the business was not being managed properly. He was collecting money in advance but not providing the services. Customers started filing complaints against him, and arrest warrants were issued for father in several states, including Maine, Massachusetts, New York and Connecticut. The family moved from state to state. They lived in Maine for several years and then moved to Massachusetts and bought a home. After losing their home, they moved to South Carolina and later to Minnesota.

A few days before Nicholas was born on December 12, 2002, father was arrested in Minnesota on a Maine warrant for theft by deception. He was incarcerated in Minnesota for several weeks before he was extradited to Maine. After being returned to Maine, he was incarcerated there until April, 2004. After father was arrested in Minnesota, mother moved with the children to Connecticut where they lived with maternal grandmother for a while and then in a shelter. While he was incarcerated in Maine, father was allowed to speak with mother twice per week due to her illness. He testified that he did not urge mother to forgo medical treatment for her cancer, but rather agreed with mother's wishes to take an organic approach.

At trial, father testified that he saw Nicholas on two occasions when the child was an infant. According to father, mother brought Nicholas to the prison to visit with father. Despite father's testimony that he saw Nicholas on two occasions, father wrote a letter to Nicholas in 2003, indicating that he loved Nicholas but had yet to see the child. See Guardians' Exhibit E.

In October/November 2003, father was amenable to consenting to standby guardianship of the children with Deborah and Alberto. Father testified that after signing the paperwork, the relationship between mother and the co-guardians seemed to deteriorate. He claimed that he later wanted to pick other guardians for Nicholas.

After father was released from prison in Maine in April, 2004, he came to Connecticut in violation of his Maine parole and stayed with his wife's cousin in New Britain. He started calling the children's guardians. He never spoke with Nicholas. A few days after coming to Connecticut, father was arrested on a Connecticut warrant for theft by deception. From April, 2004, to November, 2004, he was incarcerated in Connecticut. He lived in a homeless shelter in Hartford after being released.

From 2004 to 2006, several hearings were held in Probate Court regarding father's visitation. The Probate Court entered orders to allow father to have visitation with Nicholas, provided father complied with the recommended contact/visitation plan. As previously noted, the visitation plan required father to start to establish a relationship with the children by writing letters to them for a period of time. If there were no problems, then phone contact would be allowed. As long as the phone contact was trouble-free for a period of time, father would begin to have visits.

On January 7, 2005, the Probate Court found that father had abandoned Nicholas. Father failed to attend the hearing but was represented by counsel.

In February, 2005, father applied for state assistance and listed his children as dependents even though none of his ten children were in his care. He received only state assistance for himself.

On March 21, 2005, the Probate Court denied father's visitation request because he had failed to make any

efforts to comply with the recommendations and Probate Court orders. When he was not incarcerated, he had failed to attend probate hearings and keep his whereabouts known. He was represented in the probate action by counsel for a period of time. On or about June 20, 2006, he wrote a letter to the Avon Probate Court using a Bronx, New York address, which apparently was his sister's address.

As previously noted, on April 13, 2005, a restraining order was granted that prohibited father from having contact with Nicholas. The co-guardians tried to notify father, but his whereabouts were unknown. Father claimed that he did not know there was a restraining order against him until August, 2005. The evidence, however, demonstrated that father had knowledge of the restraining order no later than mid-May, 2005. Father was arrested for violating the restraining order, but the case was eventually dropped. Father filed a motion to open the restraining order on August 23, 2005. At the hearing held on September 20, 2005, father claimed that he was living at 118 Main Street, Hartford, Connecticut, which is a shelter where he did not have to pay rent or utilities. However, on his fee waiver, he claimed that he was paying rent and utilities. The court ordered father to repay the filing fee and marshal's fee based on the inaccuracies in his fee waiver. The court denied father's motion to open and extended the restraining order to March, 2006.

In July, 2007, father told Liz Santiago that he was not in a position to care for his children at that time. In 2008, father was arrested on out-of-state warrants and was incarcerated in Maine and Massachusetts.

According to father, he made multiple efforts over the years to contact Nicholas. Since 2003, father testified that he regularly sent Nicholas cards, letters and gifts for his birthday and Christmas. He sent a letter

and gift to Nicholas in December, 2006, addressed to "Chuck." The gift was a book about African-American history. Father was concerned that Nicholas was not learning about his heritage. He claimed that he also gave his oldest son, Joshua, gifts and cards to hand out to the children. He does not know if Nicholas received them. After the paternal grandmother died, letters were sent to all the children with $100 each, which was bequeathed by paternal grandmother.

Father testified that he has never paid any child support or contributed financially to Nicholas' care even when he was employed. At trial, father attributed his failure to financially support Nicholas with his lack of contact with the child. He was basically of the belief that he did not have to pay child support if he did not see the child.

Father testified that he was 50 percent at fault for not having a relationship with Nicholas. Father claimed that the guardians shared the blame. At trial, father admitted that the guardians did not cause him to be incarcerated or interfere with his being notified of the Probate Court hearing or with his relationship with his court-appointed attorney.

The evidence demonstrates that father's criminal involvement and failure to comply with court orders adversely affected his ability to have a relationship with Nicholas. From December, 2002, to April, 2004, father was incarcerated in Minnesota and then in Maine for theft by deception. From April, 2004, to November, 2004, he was incarcerated for related charges in Connecticut. From April/May, 2008, to April, 2009, father was incarcerated for similar charges in New York, Maine and Massachusetts. Contrary to father's testimony, the evidence demonstrates that father had only sent Nicholas a few cards, letters or gifts to Nicholas since November, 2003. He made one effort through

Joshua to give Nicholas a gift. His efforts to contact Nicholas were limited and sporadic. When he was not incarcerated, father failed to make any real efforts to comply with the recommended visitation plan and failed to attend most of the Probate Court hearings. He failed to keep his whereabouts known to the court and his court-appointed attorney. When he was incarcerated, he failed to complete the necessary paperwork to allow for visitation.

Father currently lives with his fiancée in West Hartford in a two bedroom, single-family home. He reports that he is currently employed. Father would be willing to have supervised therapeutic visits. He is willing to undergo counseling. Father wants the opportunity to establish a relationship with the child.

### D

### Child

Nicholas is the youngest of ten children of Lisa and Allen. He is now eight years old. Nicholas has special needs. He has been diagnosed with attachment disorder. He suffers from an eye condition known as strabismus and is very close to being considered legally blind. He is in the second grade and is doing well in school. He is not a special education student.

Since July, 2003, Nicholas has lived primarily with Deborah and Alberto and their biological children. Nicholas is very bonded with the guardians' family. He refers to the guardians as his mother and father. He is also very attached to their biological children. The family regularly attends church where Nicholas has contact with some of his biological siblings. The guardians have addressed all of Nicholas' special medical needs.

Nicholas is aware that Deborah and Alberto are not his biological parents. He knows that his mother is deceased and that Allen is his biological father. Nicholas

has not had any real contact with father. Deborah and Alberto have expressed a desire to adopt Nicholas if he is freed for adoption.

## E

### Maternal Relatives

Maternal grandmother, Ida S., is in her seventies. She lives on a fixed income. Before 2004, the children had lived with her on occasion. She is the foster parent of Jamie, one of Nicholas' siblings. Nicholas has had regular contact with his maternal relatives through the gatherings organized by the children's guardians.

## F

### Relevant Witness Testimony

The following witness testimony is relevant to the determination of the pending matters.

## 1

### Dr. Bruce Freedman

In January, 2008, father participated in a court-ordered psychological evaluation with Dr. Freedman, who is an expert in child and family psychology and child abuse. Nicholas and most of his siblings were evaluated. Dr. Freedman did not conduct an interactional evaluation between father and Nicholas. In his report dated February 3, 2008, Dr. Freedman made the following findings.

"REFERRAL QUESTIONS

"2. What is the present emotional and psychological status of the biological parent?

"Allen B. was the 44-year-old biological father of 10 children, 9 of whom were included in this evaluation. Mr. B. was so cautious and closed, tended so strongly to minimize problems, and his account of the past was

so at odds with other evidence, that most of his personality and past actions had to be gleaned from the accounts of others or inference from the remaining interviews.

"Mr. B. and the children's mother had been a biracial couple, alienated from Lisa's family, with minimal contact with paternal family, and general social isolation. Their extreme religious beliefs, frequent moves, home-schooling, and Mr. B.'s mistrust of people kept the family isolated, and closed to the world around them. The children had such a strong code of silence instilled in them that, after four years in placement, none of the nine would provide more than minimal detail about their past family life.

"The couple had 10 children, supported at first by Mr. B.'s income, and later by his fraudulent business activities in three states. They lost their home in Massachusetts, and begin a dizzying flight through different states and residences, sometimes moving during the night, other times expelled from the homes of others in which they overstayed their welcome.

"Mr. B. was first arrested in Massachusetts, but he had apparently been granted a period of probation. He continued his illegal activity, and was eventually apprehended in Minnesota and brought back to Maine, where he served 18 months in prison. During this time, his wife struggled with breast cancer, while trying to support and care for the 10 children. She refused any medical treatment, and those who had read Mr. B.'s letters to his wife reported that he insisted that she did not need any medical treatment.

"Once he returned to Connecticut, Mr. B. was quickly arrested and spent another 8 months in prison in Connecticut for similar charges. During this time, the Probate Court was involved, and the children began seeing Dr. David Russell. Contrary to his skewed report of this

time period, Dr. Russell and the court provided Mr. B. with a straightforward, stepwise plan to re-enter his children's lives and work toward visitation and reunification. Mr. B. refused to follow any of this plan.

"In addition, in his past 18 months in the community, Mr. B. had shown an appalling lack of effort on his children's behalf. He could have used this time to write to his children, send letters, cards, celebrate birthdays and special occasions in this way, and work toward visitation with the children. Instead, he focused solely on his oldest son, using him to deliver notes, messages, and a round of Christmas gifts to some of the children. While he claimed to have steady employment and residence, with his children not far away, he had extended the period without substantial paternal contact from 4 years to 5 1/2 years. As a result, he was now a stranger or a dimly remembered figure to most of the children.

"After being offered a plan to systematically develop contact and relationships with all of his children, Mr. B. refused to take any recommended steps. He seemed to have his own plan of somehow having the children come to him, without his having to go along with anyone else's rules or suggestions. As a result, his children spent years with close to no contact with him.

"In addition, the background provided by written documents, information provided by Ms. R. background about Nicholas, and the children's behavior and emotional problems, were all consistent with reports that Mr. B. had run his family as a tight, closed operation, supported by fraudulent business activities. As the family grew and his legal income disappeared, the family was forced to zig zag around the country, trying to avoid Mr. B.'s arrest. Later on, he continued to attempt to direct the behavior of family members by prison communication with his wife, and communication with his oldest son after her death.

"In contrast to his complaints of being kept from his children, Mr. B.'s illegal behavior, refusal to work with guardians and professionals trying to help his children, and his total lack of effort on the children's behalf, had left most of his 10 children with a deceased mother and a totally absentee father. While he probably justified his own behavior based on his view of himself as a victim of an unjust, immoral society, his behavior toward his children basically constituted abandonment of most of them. . . .

"7. Do the adult caretakers see any need for supportive services in order to address the issues which pertain to the abuse/neglect/custodial situation or the consequences of such, for the children?

"Mr. B. led a mysterious life, in which his presentation to DCF and court staff did not correspond well to the actual facts known about him. He had been offered a plan to reintroduce himself to the children several years ago, a sensible stepwise plan devised by Dr. Russell, and endorsed by the Probate Court. Mr. B. had refused to follow a single recommendation, as though he was convinced that somehow, the children would be returned to him regardless of what he did. This left his children in the care of other families for four years, with no more than an occasional gift or card to some of the children.

"Although he carefully managed his presentation, Mr. B. made it clear that the church, the psychologists who had seen the children, the courts and attorneys, were all engaged in a conspiracy against him. Engrossed in his own determination to avoid losing any 'control' of his life, Mr. B. ignored the needs and lives of his children for year after year. This had even included that last 18 months, in which he claimed to have been living and working only 10 miles from his children. He had taken no reasonable or recommended steps to see or engage

his children during this time either. His contact had basically been limited to using his oldest child, who had become a young adult, to deliver messages, a gift and pictures to the rest of the children. . . .

"11. If the children should not be allowed to live with the biological parent (with or without supervision) at the present time, when might this be possible? What are the suggested placements? What must occur first in the way of visitation? Counseling? What kind of counseling would be recommended? Other services recommended?

"Reunification of any of the children with their biological father would not be in their best interests. . . .

"FOR TERMINATION OF PARENTAL RIGHTS

"1. Considering the age and needs of the children, can the parents rehabilitate adequately and soon enough to resume responsible positions in the child's life?

"Mr. B. had made it clear through his behavior that he did not have problems requiring help, and that he would not cooperate with any therapeutic or systematic plan to reintroduce him to his children. . . .

"Without having worked with service providers, followed court recommendations, or made significant efforts on his children's behalf, Mr. B. did not show acceptable potential to occupy any role in the lives of the younger four children. He should not have any contact with them. . . ."

During the trial, Dr. Freedman testified regarding the evaluation. He believes that the opinions derived from the 2008 evaluation still remain valid today because the circumstances are the same.

In Dr. Freedman's opinion, father has self-serving opinions regarding his children and does not recognize anyone else's legitimacy regarding his children. He does

not think others have any authority. He has deep anger and resentment which plays out in his life through his control over his family.

Father has lived his life in a way that has left the children with serious psychological problems. While in his care, the children lived a transient lifestyle relocating to several different states. The children did not regularly attend school but were homeschooled by mother. Father frequently traveled on business and was not around all the time. Father also was incarcerated for considerable periods of time. Father convinced mother not to seek proper medical treatment. By the time mother arrived in Connecticut, her breast cancer had advanced beyond any treatment.

When the mother was dying, father was in prison in Maine. The children were in terrible condition. They were filthy, starving and mistrustful of adults. The children had very little idea of a normal life. Homes were found for the children.

Since the mother passed away, father has not provided support for his children. Father has been hostile towards the guardians. His hostility led to a restraining order being issued in favor of the guardians. In Dr. Freedman's opinion, any child in father's care would be at further risk for serious psychological problems.

Father has poor qualifications to care for Nicholas. He is incompetent as a parent. He dominated his family in a cruel manner and took advantage and abused his wife in the worst possible way. Father has lived his life in a way such that he has offered no security or support for his children. His attitudes and values are not compatible with a healthy family life. Through the Probate Court, the psychologist set up a well crafted plan to reintroduce father into the children's lives. However, father refused to follow the plan and basically blew it off.

Since the evaluation was completed, father has not made any real efforts to reunify with Nicholas or the other children. He has not come to any realization as to how his lifestyle has adversely affected the children. He has not engaged in therapy. He has made minimal, if any, effort to maintain contact with the children. He has not made any progress toward being in a position to have supervised visitation with the minor children.

One of the collateral contacts for the evaluation was Dr. Kerri Baker, a clinical psychologist. Dr. Baker has worked with Nicholas and the younger children. None of the younger children mentioned their father or seemed to remember or know him. Dr. Baker believed that even parent-child observations with father might be upsetting or destructive for the younger children. The younger children suffered from attachment issues. Nicholas did not see father during the evaluation because of concerns regarding potential psychological damage.

In Dr. Freedman's opinion, Nicholas has no memory of his father. His father is a complete stranger to him. There is no attachment. Father has never had any real contact with Nicholas. Father has not cared for Nicholas or provided him with any support. No parent-child relationship exists or has ever existed between father and Nicholas. It would be harmful for Nicholas to return to father's care, given father's extremely poor record of parenting and caring for his children. Contact with father would risk the secure attachments that Nicholas has developed with the guardians. Nicholas has improved in the guardians' care. Nicholas has special medical needs. Nicholas identifies the guardians as his parents. He has no real memory of his mother or father.

Dr. Freedman is of the opinion that termination of parental rights and adoption would give Nicholas the permanency he needs. It would provide legal protection

and prevent father from interfering with the family. If Nicholas was adopted by the guardians, they would be able to make decisions in Nicholas' best interest. It is important for Nicholas to be a full member of the guardians' family. Adoption would be further reinforcement and provide him with an additional source of security.

2

## Liz Santiago

Santiago testified regarding the department's involvement with the family. She wrote the probate study and has been the social worker for some of the children.

DCF first became involved with the mother and her children in 2003. The department received a referral for physical neglect. Mother was living with the children in a shelter, and father was incarcerated. Mother was dying of breast cancer. DCF investigated the family and substantiated the referral.

During the summer of 2003, the co-guardians became involved with the family through their church. The guardians stepped in to care for the children and helped find homes for them. Due to the guardians' involvement, the children were never placed in DCF care. In 2004, Nicholas' guardianship was transferred to the guardians.

When the department first became involved with the family, father was incarcerated in Maine. After being released, father came to Connecticut and was arrested and incarcerated until November, 2004. In August, 2008, he was arrested again and incarcerated until March, 2009.

Throughout the department's involvement, father failed to make any real efforts to reunify with Nicholas.

While father was incarcerated, he was entitled to visitation but did not request visits. When he was living in the community, father did not do what was necessary to have visitation. He failed to cooperate with the visitation plan ordered by the Probate Court. He did not engage in any services that would assist him in reunification. He also failed to send cards, letters or gifts to Nicholas. He has not provided any financial or emotional support for Nicholas.

Nicholas has lived with guardians since he was six months old. He has special needs, including mental health concerns relating to attachment disorder. The guardians have done everything necessary to address Nicholas' special needs.

Nicholas has no relationship with the father. He does not recognize Allen as his father. Nicholas refers to the guardians as his mother and father. Nicholas is bonded with the guardians and their biological children.

The department's position is that termination and adoption is in Nicholas' best interest. It is not in Nicholas' best interest to have any contact with father.

3

Deborah R.

In 2003, the co-guardians, Deborah and Alberto became involved with the family after a colleague of Alberto learned about maternal grandmother's plight. Her husband had died several months earlier, and her daughter was dying of breast cancer and had ten children. Mother and children had moved to Connecticut and were living with maternal grandmother. Mother was diagnosed with stage 4 breast cancer. Father was incarcerated in Maine. Debbie and Alberto offered their assistance to the family through a church service project.

When the guardians went to the maternal grandmother's home in July, 2003, they found a house filled with children. Maternal grandmother was very stressed out caring for the children. By the end of the night, it was obvious that more help was needed. When Alberto asked how else they could help, maternal grandmother said she was tired and needed help and asked the guardians about taking one of the children. The guardians decided to take Nicholas home because grandmother was losing so much sleep taking care of him at night.

Several weeks later, the guardians returned Nicholas to mother's care after DCF became involved. Mother was now living in a homeless shelter in New Haven. A week after the family moved to the shelter, mother asked Deborah and Alberto to take back Nicholas. Mother's health was deteriorating fast, and she was in a great deal of pain. Mother had not been receptive to medical treatment.

During a visit to the shelter, mother showed Deborah a notice for an administrative hearing on educational concerns regarding the children. Mother obtained standby guardianship paperwork from the New Haven Probate Court and asked Deborah if she was willing to care for the children so they would not go into DCF care.

In November, 2003, the guardians wrote a letter of introduction to father and offered to come to Maine to visit him. Father never responded to their letter or visit request. However, he did sign and return the standby guardianship paperwork.

At some point thereafter, father called the guardians' home from prison and spoke to Alberto. Alberto talked to father for about forty-five minutes regarding mother's prognosis.

Both mother and father signed off on the temporary guardianship, which became effective after mother was

transferred to Yale-New Haven Hospital due to her deteriorating health. By the end of November, 2003, all of the children were living with Deborah and Alberto.

In January, 2004, the children were still living with Deborah and Alberto and were enrolled in school. School records were not available for any of the children. Over the next few months, Deborah and Alberto worked with their church to find homes for all the older children so that they did not have to go into foster care. By April, 2004, homes were located for all the older children. The children had input as to which families they were going to live with. Mother was able to meet all of the families before she passed away in March, 2004. During this period, father did not object to the efforts to find homes for the children. In fact, the guardians did not hear from him.

During this period, Deborah and Alberto helped to arrange therapy for the children. The therapists did not have any connection with the church. Mother was not happy with the children going to counseling because she and father did not believe in counseling. Deborah testified that mother started behaving erratically as her condition worsened.

In January, 2005, the Probate Court removed father as guardian and made the guardianship permanent. When mother was dying and father was incarcerated, the paternal relatives never contacted the guardians or offered to care for any of the children. The paternal relatives have never provided any financial support for the children.

Deborah testified that father's claims that he regularly sent cards, letters and/or gifts to Nicholas are untrue. Father has made limited and sporadic efforts to contact Nicholas. On or about December 10, 2003, father sent a letter to Nicholas, which the guardians received. In that letter, father wrote: "You are so precious to me

though I have yet to meet you." See Guardians' Exhibit E. Nicholas was a year old. Father has not seen Nicholas since this letter was sent. In December, 2009, father sent two cards to the co-guardians that were addressed to "Dear Chuck." He also sent a book about slavery. The guardians still have the items but have waited to show them to Nicholas because they did not think the items were age appropriate. Nicholas is too young to understand. In January, 2010, father sent a letter to Nicholas with a note indicating that paternal grandmother had passed away and had bequeathed each of the children $100. The letter was addressed to "Dear Chuck." Father has called a couple of times to harass them. He did not call to express any interest in Nicholas.

On one occasion, father tried to use Joshua to deliver a gift to Nicholas. Deborah R. testified that the guardians thought it was inappropriate for father to use Joshua when he should have mailed the gift himself. The professionals involved with the children had recommended that father needed to step up to the plate in terms of seeking contact with the children. Alberto gave Joshua money to give the father to mail the gift, but they never received anything from father.

Deborah testified that father has not made any real efforts to have visits with Nicholas. When father was in prison in Connecticut, he filed a motion for visitation with the Probate Court. The court order provided for visitation, but father never completed the paperwork required for visitation. When father was not incarcerated, he refused to comply with the Probate Court orders. He refused to follow the recommended step-by-step visitation plan.

Since Nicholas has been in the guardians' care, father has never provided any financial support. The guardians have borne all the costs of Nicholas' care. They have not received any government assistance.

Deborah and Alberto have tried to maintain contact with all of the children through church and by having holiday and other gatherings in their home. From 2004 to 2007, monthly gatherings were held to provide the children with an opportunity to see each other.

The co-guardians have also made efforts to maintain contact with the paternal relatives. Deborah invited the paternal relatives to more than twenty gatherings. The paternal relatives only came twice. They did not respond to other invitations or said they would come but ended up cancelling. In September, 2004, the paternal grandmother and paternal uncle, Leon B., came to a gathering, which went well. It was the first time the paternal grandmother had met the maternal grandmother. The paternal relatives made no effort to contact the co-guardians or Nicholas between September, 2004, and October, 2005. In October, 2005, the paternal relatives came for a second visit. In August, 2006, after not making any contact for awhile, Leon called the guardians and wanted to make arrangements for the paternal relatives to come to Connecticut to pick up the children the next weekend and bring the children to New York to visit at Leon's recently purchased home for the day. The guardians were not invited to attend. The children hardly knew the paternal relatives, and the co-guardians did not think it was in the children's best interests to attend, given all the psychological issues they were dealing with. The co-guardians let Leon know how they felt about the plan and putting the children in a situation where the paternal relatives were basically strangers to the children. They told Leon that there were a lot of issues that he did not know about in terms of the children, and it was not in their best interest to take the trip at this stage in their recovery. Leon expressed his loyalty to his brother. The guardians lost trust in Leon after that call. The paternal aunt and uncle called around Nicholas' birthday in December,

2006. Before paternal grandmother died last year, the co-guardians were contacted about the children going to see her. But they were not supplied with her address.

The co-guardians have maintained regular contact with the maternal relatives who have attended many of the gatherings held by guardians of the children over the years.

Deborah and Alberto have not restricted Nicholas' siblings from talking about father. Nicholas has seen pictures of his biological family members. Deborah testified that she has not told Nicholas negative things about father.

The guardians have tried to abide by all the court orders. They have followed the recommendations of the professionals. They have maintained contact with the other children and the maternal relatives and tried to maintain contact with the paternal relatives. They have tried to do what they believe is in the best interests of Nicholas.

Nicholas had specialized medical needs. He has poor eyesight. He has been diagnosed with attachment disorder. He continues to receive therapy and is making some progress. He is in the second grade and is doing well in school. He is not a special education student. He needs to sit in the front because of his vision. Nicholas calls the co-guardians "momma" and "papa." Nicholas knows that he is not their biological child. He knows about his biological parents.

Deborah testified that, from the beginning, the guardians stepped into the situation and wanted to help. They are the only parents that Nicholas knows. He is integrated into their family. He is attached to the family. Nicholas refers to the guardians' children as siblings. If Nicholas is freed for adoption, they wish to adopt him. They want to give him a permanent home. If they

adopted Nicholas, they would continue to allow contact with the maternal and paternal relatives. The guardians do not believe that it is in Nicholas' best interest to develop a relationship with father given that Nicholas is now eight years old and has had no contact with father. Father has not made any real efforts to develop a relationship with Nicholas.

### 4

### Jonathan B.

Jonathan B. is Nicholas' older brother. He is currently attending college. Jonathan testified that his father has told him that he wants to have contact with Nicholas. Several years ago, Deborah told Jonathan that she would like visits between father and Nicholas. More recently, Deborah has indicated that she might see it in Nicholas' best interest to have visits with father. Jonathan does not think father has ever seen Nicholas.

### 5

### Joshua B.

Joshua B. is the oldest sibling. He is twenty-three years old. Joshua lived with the co-guardians for a few months when homes were being found for the children. He currently lives in Virginia and has limited contact with Nicholas and the guardians. Several years ago, he wanted to video chat to the Christmas gathering that was being held. He asked Deborah whether he could do it, and Deborah asked if father was going to be present. After Joshua answered in the negative, Deborah said that would be fine. Deborah said she was concerned for Nicholas' psychological well-being because father lies and seeks to spread lies. Joshua never heard the guardians say anything negative about father in Nicholas' presence. Joshua admitted that he received the March 2, 2005 e-mail from father but did not think it was a threatening e-mail. A few years ago, father

asked Joshua to deliver gifts and letters to the children, including Nicholas. Joshua called Deborah about whether he could deliver the gift and letter to Nicholas. Deborah did not want Joshua in the position of being a conduit for father having contact with Nicholas.

## 6

## Leon B.

Leon B. is Nicholas' paternal uncle. He lives in New York. After mother died, the paternal relatives were invited to gatherings that were held by the guardians of the children. Leon testified that he was invited to numerous gatherings but only came to one because he was busy living his own life. Some of the paternal relatives, including Leon, paternal grandmother and paternal aunt, attended the September, 2004 gathering. At that gathering, paternal grandmother met maternal grandmother for the first time, and Leon met Nicholas. Leon admitted sending a letter to guardians thanking them for all that they had done for the children. Leon did not remember attending any other gatherings, even though Deborah testified that Leon attended one in October, 2005. In 2007, Leon called and spoke with Nicholas for his birthday. He claims that he called other times and left messages that were not returned by the guardians. Leon claims he grew frustrated with the guardians. Leon admitted that the guardians never told him to stop calling or refused to allow him to see Nicholas. He admitted that he was unaware of any psychological issues that might exist regarding Nicholas. Leon admitted that the paternal relatives never offered to take any of the children into their care. He never made any effort to contact the courts or the attorneys regarding the children. He never sent any cards, letters or gifts to Nicholas. Before paternal grandmother passed away, Leon claims that he made efforts to arrange a phone call between her and Nicholas, but the guardians

were not helpful. The children were sent $100 as an inheritance after paternal grandmother died.

The court will provide additional facts, as needed, which are proved by clear and convincing evidence.

## III

## DISCUSSION

The court must determine whether the petitioners have proved by clear and convincing evidence that the parental rights of father should be terminated.

The maternal relatives have standing to bring the TPR action. General Statutes § 45a-715 provides in relevant part: "(a) Any of the following persons may petition the Court of Probate to terminate parental rights of all persons who may have parental rights regarding any minor child or for the termination of parental rights of only one parent provided the application so states . . . (5) a relative of the child if the parent or parents have abandoned or deserted the child . . . ." General Statutes § 45a-707 (6) provides that the term " '[r]elative' means any person descended from a common ancestor, whether by blood or adoption, not more than three generations removed from the child . . . ." See also Practice Book § 35a-19. On January 7, 2005, the Probate Court found that father had abandoned the child and denied the child proper care, and he was removed as guardian.

General Statutes § 45a-717 (g) authorizes termination of parental rights in cases originating in Probate Court. Pursuant to the statute, "the court may approve a petition terminating the parental rights and may appoint a guardian of the person of the child, or, if the petitioner requests, the court may appoint a statutory parent, if it finds, upon clear and convincing evidence, that (1) the termination is in the best interest of the child, and (2) (A) the child has been abandoned by the parent

in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . (C) there is no ongoing parent-child relationship which is defined as the relationship that ordinarily develops as a result of a parent having met on a continuing, day-to-day basis the physical, emotional, moral and educational needs of the child and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the child . . . ." General Statutes § 45a-717 (g).

In deciding the pending TPR petition, the court must first determine whether at least one of the alleged grounds for termination of the father's parental rights is proved by clear and convincing evidence.

## A

## Abandonment

The petitioners allege that the child has been abandoned by father. "A parent abandons a child if the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child . . . . Abandonment focuses on the parent's conduct. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare. . . . [The statute] does not contemplate a sporadic showing of the indicia of interest, concern or responsibility for the welfare of a child. A parent must maintain a reasonable degree of interest in the welfare of his or her child. Maintain implies a continuing, reasonable degree of concern." (Citation omitted; internal quotation marks omitted.) *In re Ilyssa G.*, 105 Conn. App. 41, 46–47, 936 A.2d 674 (2007), cert. denied, 285 Conn. 918, 943 A.2d 475 (2008). "A lack of interest in the child is not the sole criterion in determining abandonment." *In re Kezia M.*,

33 Conn. App. 12, 17, 632 A.2d 1122, cert. denied, 228 Conn. 915, 636 A.2d 847 (1993).

"Attempts to achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of interest, concern or responsibility for the welfare of a child. . . . Abandonment occurs where a parent fails to visit a child, does not display love or affection for the child, does not personally interact with the child, and demonstrates no concern for the child's welfare." (Citations omitted; internal quotation marks omitted.) Id., 17–18; see also *In re Juvenile Appeal (Docket No. 9489)*, 183 Conn. 11, 14, 438 A.2d 801 (1981); *In re Terrance C.*, 58 Conn. App. 389, 394, 755 A.2d 232 (2000).

"In the context of termination of parental rights due to abandonment, this court has stated that among the generally understood obligations of parenthood are the expression of love and affection for the child, and the expression of personal concern over the health, education and general well-being of the child." *In re Alexander C.*, 67 Conn. App. 417, 426, 787 A.2d 608 (2001), aff'd, 262 Conn. 308, 813 A.2d 87 (2003). "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child; (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing, and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Internal quotation marks omitted.) *In re Deana E.*, 61 Conn. App. 185, 193, 763 A.2d 37 (2000).

In the case of *In re Justice V.*, the Appellate Court affirmed the trial court's finding that the respondent mother had abandoned the child. *In re Justice V.*, 111 Conn. App. 500, 519, 959 A.2d 1063 (2008), cert. denied,

290 Conn. 911, 964 A.2d 545 (2009). There, the trial court took into consideration that, "[a]fter the child was removed from her custody, the respondent made no effort to have any contact with the child. She did not visit the child, did not display love or affection for the child or send cards, letters, notes or gifts to the child. . . . For more than one year, the respondent failed to approach employees of the department to initiate visits with the child . . . or to inquire about her welfare." Id., 518–19.

Based on the evidence presented, the court finds that father has abandoned Nicholas based on his lack of involvement and contact, lack of financial support and lack of interest in Nicholas.

### 1

### Lack of Involvement and Contact

Although father testified that he had contact with Nicholas on two occasions before mother died, the evidence demonstrated that father has actually never had any physical contact with Nicholas. On or about December 10, 2003, father sent a letter to Nicholas and wrote that: "You are so precious to me though I have yet to meet you." See Guardians' Exhibit E. Nicholas was a year old. While Nicholas has been in the co-guardians' care, father has not had any physical contact with Nicholas.

He failed to comply with the recommendations and Probate Court orders issued to facilitate contact/visitation. Father has failed to personally interact with the child. He has not played a significant role in the child's life. The child has never been in the father's care.

### 2

### Lack of Financial Support

Father has not financially supported the child. Father has not made any financial contribution to the child's

care even when he was employed. He has not supplied the child with necessary food, clothing, housing and medical care. He has not provided an adequate domicile. Father has not met the child's physical needs on a daily basis.

3

### Lack of Interest

Father has made limited and sporadic attempts to develop a relationship with Nicholas. By his actions, father has demonstrated a lack of interest in the child's health, education and general well-being. From 2003 to 2005, father failed to take advantage of opportunities for contact/visitation either when he was incarcerated or living in the community. He refused to cooperate with recommendations and court orders to facilitate visitation. He made limited efforts to develop a relationship with Nicholas through the sending of cards, letters or gifts. He failed to maintain contact with the co-guardians. On the contrary, his actions led to the issuance of a restraining order which was in effect from April, 2005, to March, 2006. Since March, 2006, father has not demonstrated real concern for the child's welfare and has failed to maintain a reasonable degree of interest in the welfare of his child.

The evidence shows the father's lack of interest in the child's health, education and general well-being. He has not made sufficient efforts to develop a relationship with Nicholas. He failed to demonstrate a continuing interest in the child's welfare. Father has not demonstrated or maintained a reasonable degree of interest in the child. He failed to express consistent personal concern over the child's health, education and general well-being.

Based on the evidence presented, there is clear and convincing proof that father has abandoned the child pursuant to § 45a-717 (g) (2) (A).

## B

### No Ongoing Parent-Child Relationship

The petitioners also allege that there is no ongoing parent-child relationship between father and child and to allow further time for the establishment or reestablishment of the parent-child relationship would be detrimental to the best interests of the child.

"This part of the statute requires the trial court to undertake a two-pronged analysis. First, there must be a determination that no parent-child relationship exists, and second, the court must look into the future and determine whether it would be detrimental to the child's best interest to allow time for such a relationship to develop." (Internal quotation marks omitted.) *In re Jonathon G.*, 63 Conn. App. 516, 525, 777 A.2d 695 (2001). The no ongoing parent-child relationship ground for termination "contemplate[s] a situation in which, regardless of fault, a child either has never known his or her parents, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced." *In re Juvenile Appeal (Anonymous)*, 177 Conn. 648, 670, 420 A.2d 875 (1979). "In either case, the ultimate question is whether the child has no present memories or feelings for the natural parent." Id.

"[T]he phrase 'feelings for the natural parent' refers to feelings of a positive nature." *In re Juvenile Appeal (84-6)*, 2 Conn. App. 705, 709, 483 A.2d 1101 (1984), cert. denied, 195 Conn. 801, 487 A.2d 564 (1985). "The feelings of the child are most important in determining whether a parent-child relationship exists." *In re Jonathon G.*, supra, 63 Conn. App. 526. If the child's feelings toward the parent are ambivalent, it is reasonable to

find that "no positive emotional aspects of the relationship survive." *In re Jessica M.*, 217 Conn. 459, 470, 586 A.2d 597 (1991).

For the following reasons, the court finds that there is no ongoing parent-child relationship pursuant to General Statutes § 45a-717 (g) (2) (C).

### 1

### Whether a Parent-Child Relationship Exists?

The evidence demonstrates that a parent-child relationship does not exist between Nicholas and his father. Father has not had any real contact with Nicholas. He was incarcerated when Nicholas was born. Father has not lived with the child as his caretaker. Nicholas has never been in the father's care. Father has not provided for or met, on a daily basis, the physical, emotional, moral and educational needs of the child. He has not contributed financially toward meeting the child's needs. He has not done what was necessary to have contact and visitation with the child. He has not demonstrated a sufficient degree of interest in the child's welfare.

Father is a stranger to Nicholas. Nicholas has never had a relationship with father and accordingly has no present memories or feelings for the natural parent of a positive nature. The child has not expressed any present and positive memories of or feelings for father. The child lacks positive memories of or feelings for father. The child does not recognize father as his caretaker.

Any positive relationship that the child had with the father has been all but lost over time. It has now been completely displaced. No positive emotional aspects of the relationship survive. The child either has never known his father, so that no relationship has ever developed between them, or has definitively lost that relationship, so that despite its former existence it has now been completely displaced.

The evidence demonstrates that the co-guardians have not interfered with father's efforts to establish a relationship with Nicholas. The guardians have not engaged in a pattern keeping father away from Nicholas. The guardians are not responsible for father's criminal involvement and resulting periods of incarceration. They are not to blame for father's failure to comply with the contact/visitation plan.

2

## Whether it Would be Detrimental to the Child's Best Interest to Allow Time for Such a Relationship to Develop?

The evidence demonstrates that it would be detrimental to the child's best interest to allow time for such a relationship to develop. Father's limited contact with the child was not productive towards establishing a positive parent-child relationship. Nicholas has never been in the father's care. The father is a stranger to Nicholas. Father has not demonstrated the ability to provide competent parenting. None of father's children have been in his care since 2003. Given Nicholas' age and needs, it would be detrimental to his best interest to permit additional time to develop a parent-child relationship.

For the above stated reasons, the court finds by clear and convincing evidence, that no ongoing parent-child relationship exists between father and the child, and the allowance of further time for the establishment of such a relationship with father would be detrimental to the best interest of the child.

C

## Best Interest of the Child

The petitioners have proved the adjudicatory grounds with respect to father. The next issue is whether the

petitioners have met the burden of proof as to disposition—whether termination is in the best interest of the child.

"In the dispositional phase of a termination of parental rights hearing, the emphasis appropriately shifts from the conduct of the parent to the best interest of the child. . . . [T]he trial court must determine whether it is established by clear and convincing evidence that the continuation of the respondent's parental rights is not in the best interest of the child." (Citations omitted; internal quotation marks omitted.) *In re Janazia S.*, 112 Conn. App. 69, 97–98, 961 A.2d 1036 (2009).

General Statutes § 45a-717 (h) provides in relevant part: "Except in the case where termination is based on consent, in determining whether to terminate parental rights under this section, the court shall consider and shall make written findings regarding" the following statutory factors.

"(1) The timeliness, nature and extent of services offered, provided and made available to the parent and the child by a child-placing agency to facilitate the reunion of the child with the parent . . . ."

The child has basically been in the guardians' care since July, 2003. In November, 2003, the parents agreed to make Deborah and Alberto standby guardians of Nicholas. Mother was diagnosed with terminal cancer and unable to care for Nicholas. Father was incarcerated in Maine. DCF's involvement has been limited. Due to the guardians' involvement, DCF never had to take Nicholas into care or place him in a foster home. The department has not provided services to father.

"(2) [T]he terms of any applicable court order entered into and agreed upon by any individual or child-placing agency and the parent, and the extent to which all

parties have fulfilled their obligations under such order . . . ."

The Probate Court entered orders to facilitate contact/visitation with the child, but father failed to make any real efforts to develop a relationship with Nicholas.

"(3) [T]he feelings and emotional ties of the child with respect to the child's parents, any guardian of the child's person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties . . . ."

Nicholas has not had any real contact with father. The father is a stranger to the child. The child has not demonstrated any feelings or emotional ties with respect to his father. He is closely bonded with the guardians, who he has lived with since 2003.

"(4) [T]he age of the child . . . ."

Nicholas was born on December 12, 2002, and is eight years old.

"(5) [T]he efforts the parent has made to adjust such parent's circumstances, conduct or conditions to make it in the best interest of the child to return the child to the parent's home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child . . . ."

Father has failed to sufficiently adjust his circumstances, conduct or conditions to make it in the best interest of the child to be reunified with father in the foreseeable future. He has made little effort to re-enter

the child's life. Father has not visited with the child. Father has not maintained contact with the child as part of an effort to reunite with the child.

"(6) [T]he extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."

Father claimed that the co-guardians are equally to blame for his lack of a relationship with Nicholas. The reality is that father has never had a meaningful relationship with Nicholas. Father's efforts to develop a relationship with the child were limited and sporadic. He was not prevented from maintaining a meaningful relationship with the child by an unreasonable act or conduct by anyone, or by his economic circumstances.

Having made the written findings regarding the factors delineated in § 45a-717 (h), the court must now determine whether termination of parental rights is in the best interest of the child. This is part of the dispositional phase of a termination proceeding. *In re Valerie D.*, 223 Conn. 492, 511, 613 A.2d 748 (1992) ("the determination of the child's best interests comes into play only after statutory grounds for termination of parental rights have been established by clear and convincing evidence"). In making this determination, the court can consider all events occurring through the close of the dispositional hearing. See Practice Book § 35a-9.

Generally speaking, "[t]he best interests of the child include the child's interests in sustained growth, development, well-being and continuity and stability of its environment." (Internal quotation marks omitted.) *In re Trevon G.*, 109 Conn. App. 782, 794–95, 952 A.2d 1280 (2008); *In re Tremaine C.*, 117 Conn. App. 590, 600, 980 A.2d 330, cert. denied, 294 Conn. 920, 984 A.2d 69 (2009).

"[T]he determination of a child's best interest is generally a fact intensive inquiry. . . . [T]he best interest standard . . . is inherently flexible and fact specific and gives the court discretion to consider all of the different and individualized factors that might affect a specific child's best interest." (Citation omitted; internal quotation marks omitted.) *In re Shanaira C.*, 297 Conn. 737, 759–60, 1 A.3d 5 (2010).

In addition to the statutory factors, the court has identified a number of other factors that are relevant to the determination of the best interest of the child. These factors include the following: child's age; child's bond to biological parent; child's bond to guardians; child's emotional well-being; child's interests in sustained growth, development, well-being and continuity and stability of his environment; child's lack of relationship with father; child's length of stay in guardians' care; child's need for supportive, safe, structured, stable, and nurturing caretakers; child's psychological needs and well-being; child's relationship with birth family members; child's relationship with guardians' children; child's safety; child's special needs; child's therapy; family environment; family integrity; guardians' willingness to provide long-term care and/or adopt the child; genetic bond to the parent; historical perspective of parent's child caring and parenting; home environment; parent failed to provide child with healthy home in the past and is incapable of providing child with this type of home in the future; parent minimizes or denies abuse/neglect of child; parent's ability/willingness to be a full-time unsupervised caretaker; parent's ability/willingness to make sufficient efforts to reunify; parent's ability/willingness to meet basic needs: food, clothing, shelter, and medical care; parent's ability/willingness to provide long-term care; parent's ability/willingness to resume a position as a responsible and stable parent in order for reunification to occur; parent's attitude;

parent's child protection history; parent's choice/decision to pursue a life not consistent with parenting the child; parent's concern with meeting own needs rather than child's needs; parent's constitutional right to raise child; parent's contact with child—quantity and quality; parent's cooperation or lack thereof with court orders and recommendations; parent's criminal involvement, which adversely affects parenting; parent's cultural and religious background; parent's demonstrated ability/inability to raise other children; parent's efforts or lack thereof toward reunification; parent's employment history; parent's failure to actively take responsibility for protection/care of child; parent's failure to recognize his responsibility for keeping child safe; parent's failure to recognize the traumatic impact of his lifestyle on the child; parent's failure to rehabilitate; parent's financial condition; parent's housing history; parent's inability to understand the child's needs; parent's incarceration and his unavailability to be caretaker; parent's income—adequate, stable employment; parent's involvement in child's life; parent's lack of parenting, coping and decision-making skills; parent's limited insight into the negative impact and safety concerns his decisions have made on the child; parent's minimizing his poor decision-making and blaming others for his current situation; parent's participation in services; parent's wishes and desires; parent's visitation history; parent-child relationship; parental rights and responsibilities; permanency, need for psychological testimony from professionals; the length of time the child has been in the custody of the caretaker; the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment; the nature of the relationship of the child with the birth parent; the length of time the child has been in the custody of the birth parent; the nature of the relationship of the child with the caretaker of the child; and the visitation/contact history.

Nicholas has basically lived with the guardians since he was six months old. The guardians have provided for Nicholas and raised him as one of their own children. Nicholas has been competently cared for, and his special needs have been met. Nicholas attends school and is involved in extracurricular activities in the community. Nicholas is closely bonded with the guardians and their biological children. He needs a permanent, safe and stable home as soon as possible.

Father is basically a stranger to Nicholas. He has had virtually no contact with Nicholas. He has been an absentee father. Nicholas has never been in father's care. Father has refused to take reasonable steps to have contact/visitation with Nicholas. He has not made significant efforts on his child's behalf. He has failed to put the child's needs ahead of his own. He has not demonstrated the ability to properly care for Nicholas' needs. He has not made any real efforts to reunify with Nicholas. He does not have any understanding as to how his actions have adversely affected his children's well-being. He has failed to provide psychological, emotional and physical care to the child on a consistent basis. He would not be considered the child's psychological parent.

No parent-child relationship exists or has ever existed between father and Nicholas. It would be harmful for Nicholas to return to father's care, given father's extremely poor record of parenting and caring for his children. Contact with father would risk the secure attachments and stability that Nicholas has developed with the guardians. Nicholas has been well cared for by the co-guardians. Nicholas has special medical needs. Nicholas identifies the guardians as his parents. He has no real memory of his father. The evidence clearly demonstrates that it is in Nicholas' best interest to remain with the guardians. They have been his parents and have provided for all of his physical and emotional

needs. Nicholas is bonded with them. It would be detrimental to his best interest to not be in the guardians' care.

For the above stated reasons, the court finds by clear and convincing evidence that termination of the father's parental rights is in the best interest of the child.

## IV

## CONCLUSION AND ORDER

For the above stated reasons, the termination of parental rights petition is hereby granted and judgment may enter terminating the parental rights of the respondent father.

Pursuant to General Statutes § 45a-717 (g), the court appoints Deborah R. and Alberto R. as guardians of Nicholas B. Reports shall be filed with this court as required by General Statutes § 45a-717 (j).